IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CAROL DIECKMANN, | : | Case No. 1:17-cv-73 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING DEFENDANTS'** |
| | : | **MOTION FOR SUMMARY** |
| CARE CONNECTION OF CINCINNATI, | : | **JUDGMENT** |
| LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 21). Plaintiff filed a memorandum in opposition to which Defendants have replied (Docs. 27, 28). For the reasons set forth below, Defendants' Motion will be **DENIED**.

## I. BACKGROUND

### A. Facts

Plaintiff Carol Dieckmann, a Registered Nurse, worked for Defendant Care Connection of Cincinnati, LLC ("Care Connection") from 2012 until November 2016. Care Connection provides home healthcare services to patients in the Greater Cincinnati area. The other defendants in this case, Guardian Healthcare Holdings, Inc. and Envision Healthcare Corporation, have corporate ownership interests in Care Connection.[1]

When Care Connection first employed Dieckmann, she primarily coded and reviewed Outcome and Assessment Information Set ("OASIS") forms. Home healthcare providers submitted OASIS forms to Medicare as part of their claim for reimbursement. Clinicians

---
[1] All three defendants are represented by the same attorneys and joined in the same Motion for Summary Judgment. In the interest of simplicity, the Court will refer to all three defendants jointly as "Care Connection" for summary judgment purposes.

1

completed the OASIS forms, medical billing codes were added, and then quality assurance nurses (like Dieckmann) reviewed the OASIS forms and related documents for completeness, accuracy, and consistency. Quality assurance nurses do not examine patients.

In December 2014, Care Connection—like many others in the home healthcare industry—began to outsource coding responsibilities to a third party, Fazzi and Associates ("Fazzi"). Once Care Connection contracted with Fazzi, Dieckmann and her colleagues no longer coded the OASIS forms, but they continued to review the forms to ensure accuracy and completeness before the forms were submitted to Medicare for reimbursement.

According to Dieckmann, the process works as follows. Clinicians (also called "field staff") visit patients in their homes and then complete a 17-page OASIS form, including the clinician's narrative, patient history, physical information and answers to specific questions. (Dieckmann Dep., Doc. 18 at PageID 95, 99.) Fazzi coders review the forms and provide billing codes. (*Id.* at PageID 96.) If coders needed additional information or clarification from the clinicians, the coders would note those needs on the OASIS forms. (*Id.*) The forms then go to quality assurance nurses, like Dieckmann, who ask the clinicians questions and ensure that the forms and all supporting documentation are correctly completed. (*Id.* at PageID 97.) If the nurses or coders changed the forms, the edited form should be returned to the clinician for signature. If no changes are made, the completed form progresses to prebilling. (*Id.*)

When Care Connection first contracted with Fazzi, Dieckmann's supervisor was Bev Naber, a satisfactory supervisor whom Dieckmann believed did a good job. (*Id.* at PageID 85.) Dieckmann complained repeatedly to Naber and others that Fazzi "coded something that that patient did not have." (*Id.* at PageID 100.) Examples of these errors included coding that a patient received aftercare for a fracture when the patient had undergone joint replacement

surgery rather than fracture care. (Doc. 18-23 at PageID 237.) Similarly, a Fazzi coder claimed that a keystroke error caused him to mistakenly code a 71-year-old patient as 11 weeks pregnant. (Doc. 18-26 at PageID 240–241.)

Dieckmann also objected to Fazzi staff changing clinicians' responses on the forms. "It was a huge insult to a licensed person, that they had interviewed someone in their home and someone on the other side of the world is going to tell them their answer's wrong." (Doc. 18 at PageID 100.) Dieckmann and her colleagues were not permitted to change the OASIS form errors or contact Fazzi themselves. (*Id.* at PageID 96, 101.) After "about three months," she was instructed to take all of her complaints "through Bev [Naber]." (*Id.* at PageID 100.) Naber appears to have contacted Fazzi regarding the coding errors. (*See* Doc. 18-26 at PageID 240–241; Doc. 18-23 at PageID 237.)

At some point, Dieckmann and her colleague, Cathy Owsley, came to believe that they detected a pattern of increased coding for Parkinson's disease, diabetes, and cancer, all diagnoses that increased reimbursement from Medicare. (Doc. 18 at PageID 106–107, 81.) Dieckmann considered these patterns to be evidence of fraud. (*Id.* at PageID 106–107.) She testified during her deposition that she reported the fraudulent behavior to her supervisors (Bev Naber and then Tamela Kuntzman), their supervisor (Bob James), and two representatives from Human Resources (Jamie Gause and Penelope Orr). (*Id.* at PageID 108.)

In March 2015, Owsley contacted the Department of Health and Human Services about what she perceived to be ongoing fraud. (Doc. 18 at PageID 83.) Owsley informed Dieckmann that she had done so. (*Id.*) On August 4, 2015, Owsley filed a False Claims Act complaint against Fazzi and Care Connection in the Southern District of Ohio (Case No. 1:15-cv-511).

3

On November 4, 2016, Bev Naber left Care Connection. (Doc. 18-27 at PageID 242.) Dieckmann emailed Naber regarding her resignation, "Change is hard for me, & I will miss you terribly. The truth is that I probably won't work much longer." (*Id.*) According to Dieckmann, she meant that with Naber no longer at Care Connection to protect her, Care Connection would ask her to engage in fraudulent conduct and her employment would ultimately be terminated. (Doc. 18 at PageID 109–110.)

Once Naber left, Tamela Kuntzman became Dieckmann's supervisor. Once Kuntzman became her supervisor, the process by which Dieckmann and others reviewed the OASIS forms changed. (*Id.* at PageID 109.) On November 9, 2016, Kuntzman provided Dieckmann and Owsley with a document entitled "QA – OASIS Review Process" which outlined the process by which OASIS forms would be reviewed. (Doc. 18-30 at PageID 259–62; Doc. 18 at PageID 112.) According to Dieckmann, "for the first time it [the provided instruction sheet] was telling us to do things that would have been fraudulent." (Doc. 18 at PageID 109.) Specifically, Dieckmann testified that the following instructions from Kuntzman concerned her:

1. "MEDS RECONCILED must be marked." (Doc. 18-30 at PageID 259.) According to Dieckmann, that meant Kuntzmann wanted her to sign that the medications had been reconciled even though the clinicians are the only ones who actually see the patient and are able to reconcile the patient's medications. (Doc. 18 at PageID 115.);

2. "If clinician's electronic signature is not same date as 'OASIS'- Type in Signature/Title and Date." (Doc. 18-30 at PageID 259.) Dieckmann alleges she was told that she should change the date of the clinician's electronic signature which would constitute fraud. (Doc. 18 at PageID 115.);

3. "M0090 and M0102 should be same date." (Doc. 18-30 at PageID 259.) Dieckmann alleges that she was instructed to fraudulently change either the date of the home visit or the date on which the doctor ordered the start of care to ensure the two matched. (Doc. 18 at PageID 115.); and

4. "VALIDATE OASIS – Correct Fatal Audits." (Doc. 18-30 at PageID 261.) Dieckmann acknowledged that she could properly correct clinician "skip

4

patterns" (appropriately skipping questions where the clinician's answer to a prior question dictates it be skipped), but she understood the instruction to "correct fatal audits" to require her to answer a necessary question the clinician failed to answer. This, Dieckmann testified, would constitute fraud. (Doc. 18 at PageID 116.)

Dieckmann and Cathy Owsley took issue with the instructions contained in the QA - OASIS review procedure, and Kuntzman stated, "You need to draw a line in the sand and do what you are told or leave this company." (*Id.* at PageID 113.)

The next day, November 10, 2016, Kuntzman again met with Dieckmann, Owsley, and others, but this time Kuntzman's supervisor, Sherry Flannery, joined them as well. (*Id.* at PageID 114.) During this meeting, Dieckmann and Owsley complained that following the instructions would constitute fraudulent conduct and asked who wrote the instructions. (*Id.* at PageID 116.) Kuntzman and Flannery refused to say who drafted the instructions and stated, "[Y]ou're missing the point. We're educating you on the way you need to do your job now." (*Id.*) Following the second meeting, Dieckmann and Owsley continued to process OASIS forms the way they had been processing them. (*Id.* at PageID 117.)[2]

Kuntzman asked Dieckmann to meet with her and a representative from Human Resources on November 18, 2016. According to Kuntzman, other nurses had complained that Dieckmann called them and said things like, "The higher ups are taking our jobs to Dayton," and, "CCOC was going down like the Titanic." (Doc. 18-35 at PageID 307.) Kuntzman claims she intended to discipline Dieckmann for her "rude and discourteous behavior" during the earlier meeting and for placing the disruptive calls to other nurses. (*Id.*) Dieckmann claims that once

---

[2] Dieckmann's supervisor, Tamela Kuntzman, maintains a different view of the November 10, 2016 meeting—among other things—and notes that she specifically clarified the QA – OASIS instructions to explain that no one should commit fraud. (Doc. 18-35 at PageID 305–308.) However, in deciding a motion for summary judgment, the Court must view the disputed facts in the light most favorable to the nonmoving party, in this case, Dieckmann. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*).

5

she arrived at the November 18th meeting, Kuntzman "started yelling at me again" so Dieckmann handed Kuntzman a handwritten note that Dieckmann had drafted the morning of the meeting. (Doc. 18 at PageID 120.) The note said in its entirety:

> Please accept my resignation with two weeks notice given. Last day to work will be December 2nd. I cannot be a part of any Medicare fraud. I am NOT the person who called the feds. Carol J. Dieckmann/RN

(Doc. 18-32 at PageID 268.)

### B. Procedural Posture

Plaintiff initiated this action alleging that Defendants constructively discharged Dieckmann for taking lawful action to stop one or more violations of the False Claims Act, in violation of 31 U.S.C. § 3730(h). Defendants moved for summary judgment on the basis that Dieckmann did not engage in activity protected by the False Claims Act and Dieckmann resigned her position voluntarily. Plaintiff opposes Defendants' Motion for Summary Judgment.

## II. APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly

supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

The federal False Claims Act prohibits a person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To protect employees, the Act also prohibits retaliating against employees who attempt to stop an employer from violating the False Claims Act. Specifically, the statute provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in

7

>furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Where a plaintiff offers circumstantial evidence of retaliation, the Court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394 (6th Cir. 2015). Pursuant to that framework, the plaintiff must establish a prima facie case by demonstrating that: "(1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* at 398. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the defendant meets its burden, the plaintiff must "demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.*

In the case at bar, Care Connection moves for summary judgment on the bases that Dieckmann did not engage in "protected activity" and was not discharged or otherwise discriminated against. The Court will address each argument independently.

### A. Protected Activity

For False Claims Act purposes, "internal reports 'may constitute protected activity,' provided such internal reports 'allege fraud on the government.'" *Id.* Plaintiffs may engage in protected activity "before they have put all the pieces of the fraud together" and "even if the target of an investigation or action to be filed was innocent," but "these lenient standards for establishing protected activity remain subject to a reasonable belief requirement." *Id.* at 399 (quoting, in part, *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) and

*Graham Cty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 (2005) (emphasis omitted)). As noted above, the applicable statutory language specifically includes "lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations" of the False Claims Act. 31 U.S.C. § 3730(h). "Thus, an employee's activity is protected from retaliation only if: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Jones-McNamara*, 630 F. App'x at 399–400 (quoting *Fanslow v. Chi. Mfg. Cty., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)). Thus, to have engaged in "protected activity" here, Dieckmann need not prove that Care Connection actually violated the False Claims Act, but she must establish that her allegations grew out of her reasonable, good faith belief that Care Connection was committing fraud against the government.

There is substantial evidence that Dieckmann held a good faith belief that Care Connection was committing fraud against the government. Dieckmann testified that she believed once Naber left Care Connection she would no longer be protected from fraudulent conduct. (Doc. 18 at PageID 109–10.) During the November, 2016 meetings, Dieckmann told her supervisors that following the OASIS review instructions as written would constitute fraudulent conduct. (*Id.* at PageID 116; Kuntzman Dep., Doc. 19 at PageID 338.) Finally, Dieckmann's hand-written resignation letter specifically noted, "I cannot be a part of any Medicare fraud." (Doc. 18-32 at PageID 268; Doc. 19 at PageID 340.) Thus, sufficient evidence has been presented to create a question of fact that Dieckmann had a good faith belief that Care Connection was committing fraud. The closer issue for summary judgment purposes is whether Dieckmann's belief was reasonable under the circumstances.

9

Dieckmann acknowledges that the way she reviewed the OASIS forms under Bev Naber's supervision did not constitute fraud. (Doc. 18 at PageID 118.) Care Connection notes that the instructions to which Dieckmann objected as fraudulent are strikingly similar to the prior written instructions under Naber with which Dieckmann had no concerns—e.g., "MEDS RECONCILED must be marked" versus "Make sure that 'medications reconciled' is checked" (Doc. 18-30 at PageID 259 and Doc. 18-31 at PageID 264) and "Validate OASIS – Correct Fatal Audits" versus "Validate again to be sure all fatals have gone away" (Doc. 18-30 at PageID 260 and Doc. 18-31 at PageID 266.). In addition, Care Connection explains, the allegedly fraud-inducing written instructions also instruct the reviewing nurses, "If at any time when reviewing any OASIS there are forms or adequate documentation missing, send the OASIS back to the clinician To Be Corrected." (Doc. 18-30 at PageID 262.) Therefore, Care Connection contends, Dieckmann could not reasonably believe that she was being instructed to commit fraud as any changes made would be reviewed and approved by the clinician before submission for payment.

However, Dieckmann testified that Kuntzman and Flannery instructed reviewing nurses to quit sending the OASIS forms back to the clinicians for final review. (Doc. 18 at PageID 116.) "Because when we send them back to [the clinicians], they'd have a bin full of 70, 80 things and they'd sit on them for weeks sometimes, and they'd get nowhere and go nowhere. They wanted them done so they could do the prebilling and get their money." (*Id.*) In addition, Plaintiff's expert witness, Melanie Griffith, testified repeatedly that the QA – OASIS review process form (Doc. 18-30) "is extremely concerning" because it "is a leading form" that uses "absolute terms" like "all" or "must" and fails to clarify whether the nurse reviewer or the

clinician is charged with editing the entries and documenting those changes. (Griffith Dep., Doc. 25 at PageID 755–56 and PageID 730–36.)[3]

Care Connection correctly states that Dieckmann identifies no fraudulent OASIS form submissions. (Doc. 28 at PageID 855–56.) However, the issue currently before the Court is not whether Care Connection actually committed fraud. The issue is whether Dieckmann has submitted evidence on which a jury could reasonably find that Dieckmann possessed a good faith, reasonable belief that Care Connection was committing fraud. The Court concludes that she has.

**B. Constructive Discharge**

Care Connection next contends that Dieckmann suffered no adverse employment action because she voluntarily resigned her position. Dieckmann counters that Care Connection constructively discharged her.

"Constructive discharge occurs when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Smith v. LHC Group, Inc.*, 727 Fed. App'x 100, 104 (6th Cir. 2018) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). A former employee alleging constructive discharge "need not prove that his or her employer undertook actions with the subjective intention of forcing the employee to quit . . . so long as the employee's resignation was a reasonably foreseeable consequence of the employer's actions." *Id.* at 106. Alternatively, an

---

[3] Defendants allege in their reply brief that Griffith found the OASIS Correction Policy and OASIS Correction Procedure to be "best practice." (Doc. 28 at PageID 855.) However, Griffith actually testified that one section of the OASIS Correction Procedure (Doc. 18-18) would constitute "best practice" on one issue, but that the tone of the OASIS correction procedure differed from the QA – OASIS review procedure. (Doc. 28 at PageID 737.) Griffith further testified that the OASIS Correction Policy and the OASIS Correction Procedure did NOT mitigate her serious concerns about the QA – OASIS review procedure. (Doc. 28 at PageID 742.)

employee can demonstrate constructive discharge where the employer "acts in a manner so as to have communicated to a reasonable employee that she will be terminated," and the employee chooses to resign instead of waiting to be fired. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014).

As detailed above, Dieckmann has offered evidence on which a jury could find that Dieckmann reasonably believed Care Connection was asking her to engage in fraud. At the time, Dieckmann knew Care Connection and Fazzi were the subject of a federal investigation related to Owsley's False Claims Act allegations. Under these circumstances, a jury could reasonably find that Dieckmann—like the nurse plaintiff in *Smith v. LHC Group, Inc.*, 727 F. App'x 100 (6th Cir. 2018)—had no choice but to resign or to subject herself to possible prosecution and loss of her nursing license and reputation. Thus, the Court concludes that Dieckmann has raised a genuine issue of material fact that Care Connection constructively discharged her.

Care Connection argues that the federal investigation revealed no fraud and that no other Care Connection employees felt compelled to resign even though they were in the same position as Dieckmann. First, the United States declined to intervene in Owsley's ongoing False Claims Act case against Care Connection and Fazzi. However, there are many reasons the United States may elect not to intervene, and there is no evidence in the record that the United States found no fraud here. In addition, the issue here is not whether Care Connection actually committed fraud, but whether a jury could reasonably find that Care Connection's actions subjected Dieckmann to working conditions such that a reasonable nurse in her position would have felt compelled to resign. *See Smith*, 727 F. App'x at 106.

Second, the parties agree that the other nurse in the same position as Dieckmann, Cathy Owsley, chose not to resign and, in fact, still works for Care Connection. However, at the time of Dieckmann's resignation, Owsley had already initiated her False Claims Act action, even though Care Connection was not yet aware of it. Owsley was cooperating with the federal investigators and receiving legal advice from knowledgeable attorneys. Dieckmann enjoyed no such protection. Accordingly, a reasonable jury could conclude that Dieckmann felt compelled to resign so as not to engage in fraud, even though Owsley did not.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 21), is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated: 12/19/18

S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court